UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                            Plaintiff

v.                                  Criminal Action No. 3:21-CR-44-RGJ-CHL

JAVONTE GRANT                                                       Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Javonte Grant ("Grant") moves to suppress evidence, challenging the validity of certain search warrants and arguing that law enforcement failed to honor his request to end custodial questioning. [DE 51]. This matter is ripe. [DE 53; DE 55]. For the reasons below, the Court **GRANTS in part** and **DENIES in part** Grant's Motion to Suppress. [DE 51].

## I.      BACKGROUND

In July 2019, the Federal Bureau of Investigation ("FBI") began investigating individuals for narcotics trafficking and illegal possession of firearms stemming from a gang related homicide. [DE 51 at 190; DE 51-3 at 230; DE 53 at 251]. The FBI identified Grant and co-defendant, Brandon Washington, as potential witnesses. *Id.*

On March 15, 2021, the Federal Bureau of Investigation filed a criminal complaint alleging that Grant possessed firearms and ammunition in violation of 18 U.S.C. § 992(g)(1). [DE 1 at 17]. Grant was prohibited from possessing firearms because of previous felony convictions. [DE 51-3 at 231]. Based on the criminal complaint, United States Magistrate Judge Colin Lindsay issued an arrest warrant for Grant. [DE 2].

The FBI also applied for a search warrant for phone numbers ("Phone Tracking Warrant") associated with Grant and Washington. [DE 51-3 at 226, 229]. FBI Agent Ronald A. Hornback,

1

Jr. ("Hornback") submitted a 10-page affidavit in support of the Phone Tracking Warrant.

Hornback stated the following as probable cause:

- The FBI started noticing and documenting instances where Grant was creating social media posts which displayed him possessing what appeared to be firearms.
- On February 25, 2021, the FBI believed that Grant and Washington both visited the Louisville Armory Gun Range in Louisville, Kentucky for the purposes of possession and operation firearms.
- Both Grant and Washington are prohibited from possessing firearms or ammunition as both subjects have previous felony convictions. . .
- On February 26, 2021, the FBI contacted Jefferson County Probation and Parole to discuss Grant as he is currently under supervision after he was released from prison via shock probation.  The Probation Officer (PO) advised the telephone numbers listed for Grant did not seem to be in service. . . it is unclear [where] he is residing. . .
- On March 1, 2021, the FBI conducted a search of publicly available databases and could not identify a current telephone account for Grant.
- On or about March 1, 2021, the FBI obtained the telephone account of Grant matching Target Phone 1. . . Grant was using Target Phone 1 to recently communicate [] concerning work related matters. . .
- To date, the FBI does not know the whereabouts of Grant.  The requested information will help locate and arrest Grant. . .
- Based on my training and experience, if the subject discover [sic] they have an arrest warrant, fugitives of justice often attempt to evade apprehension by staying with family or friends to avoid apprehension at their primary address.  Significant contacts to include family members and associates, [sic] will often attempt to conceal a fugitive's whereabouts and/or harbor the fugitive.  Obtaining this requested information will assist law enforcement in locating Grant and Washington in order to arrest them in a timely and safe manner.
- The requested historical call detail records with cell site information will also enable the FBI to identify patterns of activity for Grant and Washington.  This will identify general areas where they frequent and identify frequent contacts, both of which will assist in locating the subjects and potentially identifying [sic] any unknown co-conspirators.  Additionally, the prospective GPS "pings" (carrier provided Location Based Services) will assist the FBI by providing real-time location updates for Target Phone 1 and Target Phone 2.

[DE 51-3 at 227-236].  Based on Hornback's affidavit, Magistrate Judge Lindsay found probable

cause for the search.  [DE 51-3 at 226].

On March 23, 2021, Hornback applied for a search warrant for Grant's home ("Residence

Search Warrant") and three vehicles associated with Grant.  [DE 51-2 at 198, 200].  In support of

2

the Residence Search Warrant, Hornback submitted a 27-page affidavit and stated the following

as probable cause:

- The FBI began monitoring the Instagram account, "Kingwooda23["] ("IG Account" which is used by Grant. . .
- On July 4, 2020, a posting was made on the IG Account displaying Grant holding what appears to be an AK style rifle with no stock and a handgun in his waistband. The posting states "Don't tread on me; cuz fireworks ain't the only shit that get lit (guns are props for promotional use only)."  Your affiant knows from training and experience that prohibited individuals will make statements that they have possessed fake weapons in an effort to subvert illegal activity.  However, the picture contains evidence of a functioning weapon. . . the photo is consistent with a fully functioning firearm and not a prop.
- On September 5, 2020, The FBI Captured an image [] from the IG Account.  The photo displayed Grant standing next to a vehicle with the comment "Yea ima feel very offended if you ask me if I'm strapped."  The FBI believes based on training and experience that Grant is indicated he is carrying a firearm.  Additionally, the photo displays what appears to be a handgun in his waistband.
- . . . [O]n February 17, 2021, the IG Account displayed Grant holding what appears to be a Glock handgun with an extended magazine. . .
- On February 25, 2021, The FBI observed a video posted to the IG Account, the video displayed several suspected firearms on a table at the Louisville Armory Gun Range (LAGR) in Louisville, Kentucky.  The FBI could visually identify an AR-15 style pistol and two Glock style pistols. . .The video snippet was captioned "Long distance watch me work!! #BDA #10k!! # FL!!."  The FBI believes that statement is indicative that Grant is potentially getting ready to fire weapons at targets inside a gun range.
- The IG Account displayed two additional video snippets depicting a typical range target with what appear to be bullet holes. . . the video images displayed "M16" and "G21 & G22."  The FBI knows the gun manufacturer Glock distributes the Glock 21 and Glock 22 models. . .
- [M]embers of the FBI traveled to the LAGR to attempted to locate Grant. . . one or two employees [] confirmed Grant was there. . .
- On February 26, 2021, the FBI returned to the LAGR and spoke to D.M. who was able to pull surveillance footage from numerous cameras.  The FBI identified Grant as one subject. . . Grant and Washington entered the facility carrying a rifle bag and a long white box which would typically contain long guns. . .
- The two enter the facility, they purchase targets and other items, enter the firing range, affix range targets, place multiple firearms on the shooting table, load the various weapons, and operate the weapons.
- From the surveillance video, the FBI obtained images of Grant handling and firing and handgun and AR-style pistol. . .
- Grant also utilized a cellular device to capture images of his visit to the range which is clearly displayed in the surveillance video.  The FBI knows from training and experience that his electronic device may result in attributable evidence.  For

example, the images that Grant captured on his device is likely retained on the device.  Moreover, it is typical that modern "smart phones" utilize a cloud account that retains digitally created pictures or videos that can be accessed by a laptop or desktop computer connected to the internet.  A digital device also contains location information that can be analyzed to determine the location of Grant during his visit to the LAGR.  Text messages and call logs may display the communication between Grant and Washington leading up to them meeting to drive to the LAGR.  Lastly, the FBT knows based on training and experience that individuals who possess firearms, legal or illegally, will often times capture and retain digital images to share with others or use the digital image to advertise the firearm for sale.  All of the aforementioned information provided, relative to electronic devices, can be digitally extracted by law enforcement with available computer software.  The FBI also knows based on training and experience that digital devices are almost always located in a residence, a vehicle, or on the person.  Therefore, the FBI would request authority to locate electronic evidence and forensically search the digital items.

- Lastly, the LAGR video surveillance displayed that Grant arrived in a vehicle driven by Washington and possessed at least three firearms.  The FBI knows from training and experience that these items are typically stored either in their residence or vehicle.  Like many citizens, people possess firearms for protection and will keep them on their person as they drive in a vehicle.  Alternatively, individuals will keep store [sic] firearms inside a residence for home protection and storage reasons.

[DE 51-2 at 198-225].  The affidavit included pictures and screen captures from Grant's IG Account and the LAGR surveillance video. [DE 51-2 at 204-213].  Hornback identified "property to be seized," including: "Electronic devices or storage media used as a means to commit the violations described above. . . browsing history. . . records of or information about the Devices' Internet activity, including. . . search terms that the user entered into any Internet search engine." Based on Hornback's affidavit, Magistrate Judge Lindsay found probable cause for the search. [DE 51-2 at 198].

On March 24, 2021, the FBI executed the search and arrest warrants and then interviewed Grant in a recorded session.  [DE 51 at 191; DE 53 at 253].  Hornback advised Grant of his *Miranda* rights shortly after entering the interview room, and Grant signed the *Miranda* waiver form before answering the agent's questions.  [DE 35 at 264].  Grant states that approximately 10 minutes into this interview he told the agents "he just wanted to see a lawyer, see a judge about getting bond

4

and that he did not want to say anything to the agents. . ." [DE 51 at 194].  Grant asserts that the agents' response was to tell him there was no bond, this was his opportunity to help himself and give them information, and then they continued to discuss the circumstances of his arrest.  [DE 51 at 194].  Grant says he then told the agents "I don't want to talk no more,"  at which point the agents left the room, and reentered six minutes later and, without readvising him of his rights, they started asking him questions again.  [DE 51 at 194].

The next day Magistrate Judge Lindsay held a detention hearing, found that Grant was a danger to the community, and ordered his detention.  [DE 14; DE 48].  On May 11, 2021, a grand jury indicted Grant, charging him with one count of possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), two counts of possession of ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(l), 924(a)(2), one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(l), 924(a)(2), and one count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A).  [DE 27].

## II.      DISCUSSION

Grant challenges the validity of the warrants asserting the affidavits failed to establish probable cause and were overbroad. [DE 51 at 191-196].  As a result, Grant argues the Court should suppress any evidence obtained from the warrants.  [*Id.*].  Grant also argues that agents failed to honor his right to end custodial questioning, and thus his statements must be suppressed. [*Id.*].

### A. Validity of the Warrants

Grant argues that the Phone Tracking Warrant lacked probable cause.  [*Id.* at 191].  He alleges that no nexus exists between the location to be searched and the evidence sought because

the stated purpose was to locate him rather than seek evidence of a crime. [*Id.*]. He also argues that his connection to the phone number insufficient as the evidence against him is slim. [*Id.*]. Further, he contends that the Phone Tracking Warrant is overbroad, seeking 90 days (45 historical and 45 prospective) of tracking data, because there was no reason to believe that agents could locate him in a shorter period. [*Id.* at 191-92]. The United States disagrees. [DE 53 at 253-261].

Grant argues that the Residence Search Warrant also lacked probable cause. [DE 51 at 193]. He alleges that the affidavit lacked the requisite nexus as it fails to support the assertion that agents could locate evidence of the gun crimes in Grant's residence or vehicles. [*Id.*]. He further contends that the Residence Search Warrant is overbroad because it requests to search electronic devices and internet activity which have nothing to do with the asserted firearm offenses. [*Id.* at 193-94]. The United States again disagrees. [DE 53 at 253-261].

1. Standard

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir. 1975)). A place has been particularly described when two separate concerns have been addressed: "one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take; and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Upham*, 168 F.3d 532,

6

535 (1st Cir. 1999)) (internal quotation marks omitted).  Suppression of a constitutionally defective search is inappropriate where the good-faith exception to the exclusionary rule applies.  *United States v. Leon,* 468 U.S. 897 (1984).

"It is well settled that in seeking suppression of [physical] evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)).  The defendant's burden extends to both "the burden of production and persuasion."  *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014), *as amended* (Oct. 21, 2014).

2.  Probable Cause for the Phone Tracking Warrant

Grant asserts that the only evidence connecting him to the phone number in the warrant is one phone call "regarding work-related matters a few weeks before," and that there were no allegations that the phone number "was ever used in connection with any criminal activity."  [DE 51 at 192].  Grant argues that this is an unjustified expansion of cell-phone tracking warrants because agents sought the warrant to locate him, rather than seek evidence.  There is thus no nexus between the "location sought to be searched and the evidence sought to be seized" required to establish probable cause.  [*Id.* at 191].

The United States argues that probable cause was established for the Phone Tracking Warrant. The criminal complaint and arrest warrant had been issued, and the FBI had tried to locate Grant, as outlined in the affidavit: they had contacted Grant's probation officer and learned (among other things) that the phone number probation had for Grant "did not appear to be in service," and "that it was unclear if the defendant was residing at the address [probation] had for him." [DE 53 at 255].  The FBI also searched public databases and obtained the phone number on the Phone

7

Tracking Warrant from Grant's employer. [*Id.* at 255]. In the affidavit, Hornback described the purpose of the phone information as identifying general areas where Grant and his contacts frequented and real-time location updates, all which would help the FBI locate and apprehend Grant. [*Id.* at 256].

An issuing judge will grant a warrant if the allegations contained within the warrant affidavit establish that there is "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). The reviewing court must give great deference to the magistrate judge's finding of probable cause, (*United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)), and should only overturn the validity of a search warrant issued where the magistrate judge "arbitrarily exercised his or her authority." (*United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013)). The reviewing court is to examine the totality of the circumstances within the affidavit. *United States v. Ferguson*, 8 F.3d 385, 391–92 (6th Cir. 1993). Line-by-line scrutiny of the supporting affidavit is inappropriate, and the reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." *See United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)); *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).

The Sixth Circuit has not directly addressed whether the affidavit must show only "a fair probability that the phone's data 'will aid in a particular' investigation and disclose evidence of criminal activity" or if it must show "a fair probability that the phone itself is being used 'in connection with criminal activity.'" *See United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021) (quoting *United States v. Powell*, 943 F. Supp. 2d 759, 779 (E.D. Mich. 2013), *aff'd,* 847 F.3d 760 (6th Cir. 2017)) (stating that the Court need not resolve the issue). The affidavit

8

connected the phone to Grant, who went to the Louisville Armory Gun Range, where he allegedly possessed firearms and took pictures and videos of himself with those firearms. [DE 51-2 at 207-09; DE 53 at 255]. These pictures and videos could be located on his cell phone. As a result, the phone's location was likely to yield useful evidence, including Grant's location and evidence of criminal activity. As a result, whether the affidavit must show a fair probability that the "phone's data 'will aid in a particular' investigation and disclose evidence of criminal activity' or "a fair probability that the phone itself is being used in connection with criminal activity," such nexus existed. *Sheckles*, 996 F.3d at 338. Under the totality of the circumstances, the affidavit supported a finding of probable cause for the Phone Tracking Warrant.

### 3. Overbreadth of the Phone Tracking Warrant

Grant contends the Phone Tracking Warrant is temporally overbroad because it requests 90 days of location tracking data, 45 days each of historical and prospective data. Grant asserts there was "no reason to expect that Mr. Grant could not be located with the warrant in far fewer than 90 days." [DE 51 at 191-92]. Grant also contends that the Phone Tracking Warrant is an invasion of privacy because agents could have obtained his address by searching publicly available databases. [*Id.* at 192].

With respect to the overbreadth of electronically stored information sought, the Sixth Circuit has repeatedly found that searches of electronic media create "practical difficulties" that require a flexible approach to applying the particularity requirement. *See, e.g.*, *United States v. Evers,* 669 F.3d at 653–54 ("[A] computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.") (quoting *Richards,* 659 F.3d at 536); *see also United States v. Lucas,* 640 F.3d 168, 178 (6th Cir. 2011). When analyzing the breadth of electronically stored information sought in a warrant, the Sixth Circuit has looked to

whether the temporal scope of an electronic search is tailored to the period in which other evidence suggests that illegal activity occurred. *See United States v. Hanna*, 661 F.3d 271, 287 (6th Cir.2011). Ultimately, "[a] search warrant must particularly describe the things to be seized, but the description, whose specificity will vary with the circumstances of the case, will be valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *Guest v. Leis,* 255 F.3d 325, 337 (6th Cir. 2001). When a warrant is found to be overbroad, the Court must only suppress evidence seized pursuant to that part of the warrant. *Hanna*, 661 F.3d at 286.

As to the historical temporal breadth, the Supreme Court has held that the when the government wishes to acquire historical phone data (or "cell-site location information") it "must generally obtain a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2221, (2018). By issuing the warrant, the magistrate judge found that there was probable cause to issue the warrant, and that 45 days of historical data was not overbroad. As to the prospective temporal breadth, Federal Rule of Criminal Procedure 41 provides that: "[a] tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used. The time must not exceed 45 days from the date the warrant was issued." Fed. R. Crim. P. 41(e)(2)(C). A "technical violation" of this rule (such as obtaining a warrant from a state court judge instead of a magistrate judge) is suppressed only if the defendant can demonstrate that either (1) the violation of Rule 41 prejudiced him, or (2) the failure to follow the rule was intentional and deliberate. *United States v. Stetkiw*, No. 18-20579, 2019 WL 422200, at *1 (E.D. Mich. Feb. 1, 2019); *United States v. Searp*, 586 F.2d 1117, 1125 (6th Cir. 1978). By issuing the warrant, the magistrate judge found that there was probable cause to issue the tracking warrant, and that 45 days from the date the warrant was issued was a reasonable length of time. There was no technical

violation of the rule, and even if there was, there is no evidence of prejudice or intentional and deliberate failure to follow the rule, and the warrant cannot be suppressed on that basis. *See Stetkiw*, 2019 WL 422200, at *3 ("Because [defendant] fails to show the violation of Rule 41 prejudiced him or that the violation was intentional and deliberate, suppression is unwarranted"). Regardless, the proper remedy would be severance of the evidence taken specifically under the overbroad search term, not suppression. *Hanna*, 661 F.3d at 286; *United States v. Rarick*, 636 F. App'x 911, 915 (6th Cir. 2016). Grant points to none here, so his argument fails. *See United States v. Carter*, 792 F. App'x 366, 369 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2675 (2020).

Grant neither cites authority for his assertion that the 90 days of location tracking is overbroad, nor that 45 days each of historical and prospective data is excessive. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *see also Singleton v. Astrue*, No. CIV.A. 09-333-GFVT, 2010 WL 6004448, at *3 (E.D. Ky. June 28, 2010), *report and recommendation adopted,* No. CIV. 09-333-GFVT, 2011 WL 843965 (E.D. Ky. Mar. 9, 2011), ("It is well-established that courts are not obligated to consider unsupported arguments inadequately developed in the briefs") (quoting *Lewless v. Sec'y of Health & Hum. Servs.*, 25 F.3d 1049 (6th Cir. 1994) (Table) (internal quotation marks and formatting omitted). "It is well settled that … the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *Rodriguez-Suazo*, 346 F.3d at 643 (quoting *Feldman*, 606 F.2d at 679 n.11). The defendant's burden extends to both "the burden of production and persuasion." *Patel*, 579 F. App'x at 453. Grant has not sufficiently developed his temporal overbreadth argument to justify suppression.

Grant also contends that the Phone Tracking Warrant is an invasion of privacy because agents could have obtained his address by searching publicly available databases.  [DE 51 at 192]. In opposition, the United States's Response cites *United States v. Riley*, 858 F.3d 1012 (6th Cir. 2017), finding that tracking a fugitive's cell phone GPS coordinates did not amount to a Fourth Amendment search, and *United States v. Skinner*, 690 F.3d 772 (6th Cir. 2012) (superseded on other grounds by statute), holding that a defendant did not have reasonable expectation of privacy in inherent location data broadcast from his cellular phone.  [DE 53 at 256].

Here, the affidavit for the warrant included the fact that a criminal complaint and arrest warrant had already been issued, and that the FBI had previously attempted to locate Grant using public databases before seeking this Phone Tracking Warrant.  [DE 53 at 255]. As a result, Grant's arguments regarding his privacy are factually inaccurate as the FBI had already attempted to locate him without success in the manner he argues appropriate.

Additionally, the Court notes that both *Riley* and *Skinner* are inapplicable here because they differ in one important respect: they analyze the expectation of privacy where no warrant has been issued – but here a search warrant was issued.  *Riley*, 858 F.3d at 1016; *Skinner*, 690 F.3d at 776.  Search warrants protect individuals' privacy rights by limiting the intrusion of privacy and requiring a neutral magistrate to determine whether that intrusion is justified.  *See Skinner v. Railway Lab. Executives' Ass'n*, 489 U.S. 602, 621-22, (1989).  Privacy interests are protected under the Fourth Amendment when they are reasonable.  *Dow Chem. Co. v. U.S. By & Through Burford*, 749 F.2d 307, 312 (6th Cir. 1984), *aff'd sub nom. Dow Chem. Co. v. United States*, 476 U.S. 227 (1986).  The word "reasonable" is used in Fourth Amendment analysis in two ways: (1) "reasonable expectation of privacy," and (2) "reasonable search."  *Id.*  The first refers to whether there was a warrantless search (which is not at issue here), and the second "refers to whether

'probable cause' existed or whether the agents exceeded the limits of the warrant." *Id.* Whether probable cause existed when the warrant was issued has been explained above. This leaves the question of whether the officers exceeded the limits of the warrant. No evidence or arguments were presented to support the assertion that agents exceeded the scope of the warrant. Therefore, any concerns regarding Grant's privacy rights are addressed in the probable cause analysis *supra*.

        4.  <u>Probable Cause for the Residence Search Warrant</u>

Grant argues that there was no probable cause to issue the Residence Search Warrant because it did not allege the weapons were in his residence or vehicles. [DE 51 at 193]. He reasons that the IG Account posts where he appears to possess firearms "state that the firearms are props" and there is "no indication on the photos when they were taken." [*Id.*]. Grant contends there are no witness that report having seen him "with an actual firearm outside the firing range." [*Id.*].

In opposition, the United States asserts that the affidavit describes the FBI's investigation, the surveillance videos at the gun range showing Grant firing a firearm, and witnesses at the gun range identifying Grant with two long guns and three pistols. [DE 53 at 257-58]. The United States cites case law finding that "[f]irearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time," *United States v. Pritchett*, 40 F. App'x 901, 906 (6th Cir. 2002), and that a suspect's residence "is more like a secure operational base than a mere forum of convenience." *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015). [DE 53 at 258]. The United States argues that Grant "arrived at the gun range with firearms, fired them at the range, and left with them," to return to his residence. [DE 53 at 258].

The Court looks at the totality of the circumstances within the affidavit, giving deference to the issuing magistrate's finding of probable cause. *See Jenkins*, 396 F.3d at 760, *Allen*, 211 F.3d at 973, *Brown*, 732 F.3d at 573, *Ferguson*, 8 F.3d at 391–92, and *Jackson*, 470 F.3d at 306.

The Sixth Circuit has consistently held that a magistrate may infer a nexus between the place to be searched and the evidence sought, based on the nature of the evidence and the type of offense. *See, e.g.*, *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008) ("an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence"); *United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009) ("it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence"). Here, the affidavit included images from Grant's IG Account and still images from the gun range surveillance video, as well as eyewitness accounts from gun range employees that Grant was carrying firearms. [DE 53 at 257-58]. Based on this evidence, it was reasonable for the magistrate to infer that Grant would keep guns in his cars or residence. *Williams*, 544 F.3d at 688; *Gunter*, 551 F.3d at 481. Under the totality of the circumstances, the affidavit provided probable cause for the Residence Search Warrant.

5.   Overbreadth of the Residence Search Warrant

Grant also contends that the Residence Search Warrant is overbroad. He asserts it requests to search electronic devices and internet activity that cannot be used to commit the firearm offenses at issue and that accessing internet activity violates his privacy. [DE 51 at 193-94]. Grant also asserts that the Residence Search Warrant is a general fishing expedition in violation of the Fourth Amendment, citing the Supreme Court's references to "general warrants" and "writs of assistance" in the colonial area and its acknowledgment of the privacy concerns applicable to cell phones. *Carpenter v. United States*, 138 S. Ct. 2206, 2251 (2018); *Riley v. California*, 573 U.S. 373, 403 (2014); [DE 51 at 194].

The United States argues that the search of the electronic devices and internet activity is appropriate because Grant used a cellular device to capture images of his visit to the gun range. [DE 53 at 257-58]. The United States also points out that the affidavit specifically described the

evidence that was likely probable to be located on Grant's electronic devices, "including pictures, videos, location information, text messages, and call logs."  [*Id.*].

"The phrase 'general search' embodies a specific Fourth Amendment term of art, accompanied by particular rules, policies, and remedies." *United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007).  Officers engage in an impermissible "general search" when their search unreasonably exceeds the scope of a valid warrant. *Id.* (citing *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999)).  A valid warrant requires particularity, which "eliminates the danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *See United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991).  Warrants should not be overbroad which requires that the warrant is "as specific as the circumstances and the nature of the activity under investigation permit," but the "degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *Id.*  Federal courts "rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers, because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity such that a broad, expansive search of the computer may be required." *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (internal citations and quotations omitted).

Here, because the magistrate judge issued a search warrant adequately describing items subject to seizure, and Grant does not allege that the officers exceeded the scope of the Residence Search Warrant, there was no general fishing expedition or violation of privacy. *See Garcia*, 496 F.3d at 507 ("for purposes of general search analysis, we will find that an officer flagrantly disregards the limitations of a warrant only where he exceeds the scope of the warrant") (citations omitted).  The affidavit was also sufficiently particular, in that it described the firearm offenses at

issue, described Grant's use of an electronic device to photograph his visit to the gun range, and the reasonable relation between the electronic devices, internet activity, and the offenses.  [DE 51-2 at 215].  Hornback attached image and video evidence of the firearm offenses, messages and call logs, location information, and a cloud account retaining this potential evidence. [DE 51-2 at 215]. *See United States v. Bussell*, No. 3:10-CR-159, 2011 WL 7473444, at *39 (E.D. Tenn. Dec. 16, 2011), *report and recommendation adopted,* No. 3:10-CR-159, 2012 WL 775431 (E.D. Tenn. Mar. 8, 2012), (finding a search warrant authorizing seizure of electronic equipment and computers reasonable when the charged crime was drug trafficking); *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003) ("even evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant") (citations and internal quotation marks omitted).  Therefore, the Court finds that the Residence Search Warrant is not overly broad and, instead, is "as specific as the circumstances and the nature of the activity under investigation permit[ted]," *Leis*, 255 F.3d at 336 (citation and internal quotation marks omitted).

6.  <u>Good Faith Exception as Applied to the Warrants</u>

Because both the Phone Tracking Warrant and Residence Search Warrant were supported by probable cause and not overly broad, the Court need not determine whether the good-faith exception applies.  But for the sake of completeness, the good-faith exception would apply if the warrants were invalid for lack of probable cause or overbreadth.  The Supreme Court explained that a court should not exclude evidence when an officer's reliance on a warrant later found to lack probable cause was objectively reasonable. *Leon*, 468 U.S. at 922. *Leon* identified four situations in which an officer's reliance on a later invalidated search warrant *could not* be considered objectively reasonable: (1) when the warrant is issued based on an affidavit that the affiant knows

contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed valid.  *Id.* at 922–23.

The United States argues that none of the four circumstances identified in the *Leon* court would preclude the exception from applying to either warrant.  [DE 53 at 261].  Grant responds that the officers were not acting in good-faith because they did not try to locate him through less invasive measures, they "asked for a warrant authorizing a complete rummaging search through his cellphone data in support of his offense of prohibited person in possession of a firearm." [DE 55 at 274-75].  Grant does not argue that any of the four specific situations identified in *Leon* apply. [*Id.*].

Here, there is neither evidence – nor does Grant develop an argument – that any of the four *Leon* situations apply.  There is no evidence that the affidavit in either warrant reflected information the affiant knew was false, that the issuing magistrate was serving as a rubber stamp, that affidavits were objectively unreasonable, or that the warrants are facially deficient.  As a result, the *Leon* good-faith exception would apply, and suppression of either warrant would be inappropriate.

## B.  Right to End Questioning

Grant argues that agents failed to honor his right to end custodial questioning.  He asserts that he tried to end questioning twice, first when he stated that "he just wanted to see a lawyer, see a judge about getting bond and that he did not want to say anything to the agents," and second when he told the agents "I don't want to talk no more."  [DE 51 at 194].  The United States

disagrees asserting that these statements were not unambiguous requests to end questioning.  [DE 53 at 262].

      1.  Standard

      The Supreme Court has held that "the admissibility of statements obtained after a person in custody has decided to remain silent under *Miranda* depends on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda v. Arizona*, 384 U.S. 436, 474, 479 (1966)).  "The purpose of *Mosley's* 'scrupulously honored' requirement is to safeguard against 'repeated rounds of questioning' that can serve to 'undermine the will of the person being questioned.'" *Davie v. Mitchell*, 547 F.3d 297, 308 (6th Cir. 2008) (quoting *Mosley*, 423 U.S. at 102).  "The police violate *Mosley's* admonition where they 'fail[ ] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.'"  *United States v. Howton*, 260 F. App'x 813, 818 (6th Cir. 2008) (alteration in original) (quoting *Mosley*, 423 U.S. at 105–06).

      There are no 'magic words' that invoke a suspect's right to silence, *Emspak v. United States*, 349 U.S. 190, 194 (1955), but the interrogatee's intent to remain silent must be clear and unambiguous.  *Berghuis v. Thompkins*, 560 U.S. 370, 380–83, (2010); *Davis v. United States*, 512 U.S. 452, 461-62 (1994); *United States v. Calvetti*, 836 F.3d 654, 661 (6th Cir. 2016).  Statements elicited after an accused properly invokes his right to silence are inadmissible.  *Mosley,* 423 U.S. at 103–04.  Of course, "suspects who invoke their *Miranda* rights remain free to change their minds." *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015).  If the defendant indicated a "willingness to discuss the investigation without influence by authorities," then later statements

are admissible if the defendant "knowingly and intelligently waived his rights to counsel and silence." *Id.* at 304–05.

    2.  <u>Application</u>

        *a.  "I Want to see a lawyer, see a judge about getting a bond"*

The parties do not dispute that Grant was in custody during the agent's questioning.  Grant argues he tried to end the questioning when he said that "he just wanted to see a lawyer, see a judge about getting bond and that he did not want to say anything to the agents."  [DE 51 at 194].  Grant contends that the agents' response was to tell him there was no bond and that this was his opportunity to help himself by give them information, and then they continued to discuss the circumstances of his arrest.  [*Id.*].  The United States responds that this was not an unambiguous request for an attorney but "more akin to a mis-speak," that Grant "appears to have meant to say that he wanted to see a judge about a bond, and that when he said 'lawyer,' he quickly corrected himself."  [DE 53 at 264].

Grant's statement that he wanted to "see a lawyer, see a judge" is difficult to interpret.  The Court reviewed the video of the questioning.  Even after this statement, Grant continues to speak with agents and to engage with them.  [Interview 3:14:05-3:30:12].  Based on the videotaped interview and the facts presented, the Court finds that Grant's first statement, that he just wanted to see a lawyer or a judge about getting a bond, was not an ambiguous expression of his right to remain silent.  *Davis*, 512 U.S. at 459, ("if a suspect makes a reference . . . that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking. . . [*Miranda*] does not require the cessation of questioning") (emphasis in original); *see also Berghuis*, 560 U.S. at 381–382 ("a statement concerning the right to counsel 'that is ambiguous or equivocal' is insufficient to invoke a suspect's right to silence),

*and Davis*, 512 U.S. at 462 ("[m]aybe I should talk to a lawyer" was not an unambiguous request for counsel). Thus, Grant's motion will be denied as to this argument.

      *b.   "I Don't want to talk no more"*

Grant argues that he tried to end his questioning a second time about twenty-six minutes into the interview, when he told the agents "I don't want to talk no more." [DE 51 at 194; Interview 3:30:12]. At this point the agents left the room, then reentered approximately six minutes later and, without readvising him of his rights, they came back in the room and said "hey real quick, you had three cars at the apartment, um, the Charger specifically was stolen, what do you know about the Charger?" [Interview 3:36:20-52]. The agents tell Grant that they are "not asking you any trick questions or nothing, we're really just trying to figure out the back story on the car, that's all. (pause) I don't even think there's a federal charge for a stolen vehicle. So I don't think you have anything to worry about, as far as like getting in trouble, I'm just trying to like figure out the back story on the Charger, how to get it back to the person it belongs to. [Interview 3:39:40-3:40:02]. When Grant doesn't respond, the agents sit in silence, looking at him

After approximately six minutes of questions about the vehicles, the agent asks Grant, "I asked you a lot of questions Javonte, do you have any questions for us, man?" [Interview 3:42:21]. To this, Grant responds, "This is crazy, bro. So I'm about to go to jail, because, for some guns I don't own, they're not mine. And the gun that was mine, in my shit, is my girl's. So I'm basically going to jail for some shit that I didn't even." [Interview 3:42:29-3:43:12]. At that point the agent interrupts Grant and starts talking about the gun problem in Louisville. [Interview 3:43:12].

Grant argues that, when the agents asked Grant if he had any questions, they re-initiated the contact. [DE 51 at 194]. The United States responds that the agents left the room because Grant was upset and emotional, and the agents only returned to ask unrelated questions about the

car he had been driving which had been reported stolen to help return it to the owner.  [DE 53 at 264-65].  The United States contends that Grant re-initiated the line of discussion about the guns and charges against him, not the agents.  [DE 53 at 264-65].  In support, the United States cites to *Oregon v. Bradshaw*, 4662 U.S. 1039, 1045-146 (1983) (holding that defendant initiated the conversation after invoking his right to counsel, when he asked officers, "What is going to happen to me now").  [DE 53 at 265].  Grant points out that the agents left for only six minutes, they did not re-Mirandize him, and that if the car they were asking about had been stolen, they should be looking at the police report rather than asking him questions about it.  [DE 51 at 194].

Grant's statement approximately twenty-six minutes into the interview, "I don't want to talk no more," appears on its face to be a clear and unambiguous invocation of his intent to remain silent.  *See Berghuis*, 560 U.S. at 382 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police.  Had he made either of these simple, unambiguous statements, he would have invoked his 'right to cut off questioning.'") (citing *Mosley,* 423 U.S. at 103 and *Miranda*, 384 U.S. at 474), s*ee also Vega v. Woods*, No. 2:15-CV-116, 2016 WL 6684811, at *3 (W.D. Mich. Oct. 24, 2016), *report and recommendation adopted,* No. 2:15-CV-116, 2016 WL 6679550 (W.D. Mich. Nov. 14, 2016), ("I don't talk no more. That's it" during an interrogation was unambiguous); *but see United States v. McWhorter*, 515 F. App'x 511, 517 (6th Cir. 2013) ("'I don't want to talk to you anymore" after arguing and while walking with officers was ambiguous given context).

There is no bright line rule for determining whether officers have scrupulously honored a suspect's right to cut off questioning.  *Fleming v. Metrish*, 556 F.3d 520, 529 (6th Cir. 2009).  But "[f]actors favoring a finding that the police have scrupulously honored a defendant's rights include where '[1] the police . . . immediately ceased the interrogation, resumed questioning only after [2]

the passage of a significant period of time and the provision of a fresh set of warnings, and [3] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.'" *Id.* (citing *Mosley*, 423 U.S. at 106). These factors are not exhaustive, nor is any factor dispositive or predominant. *Id.*

The factors weigh in favor a finding that the agents did not scrupulously honor Grant's right to remain silent. The first factor, whether the agents immediately ceased the interrogation, favors finding that the agents did honor Grant's right to silence–the agents almost immediately stopped talking to him and left the room after his declaration that he didn't want to talk. [Interview 3:30:12-3:36:52]. *See Flick v. Meko*, No. 14-5760, 2015 WL 13542567, at *3 (6th Cir. Oct. 20, 2015) (when agent stopped asking suspect questions, it supported a finding that his rights were scrupulously honored).

The second factor favors finding that agents did not honor Grant's right to silence–the agents returned to the same room only six minutes later and did not provide fresh warnings. Courts have characterized "a significant period of time" typically as several hours; in *Mosley*, it was "an interval of more than two hours." 423 U.S. at 104; *See, e.g.*, *Fleming*, 556 F.3d at 529 (three hours); *United States v. Lugo Guerrero*, 524 F.3d 5, 12 (1st Cir. 2008) (four hours); *United States v. Corral-Martinez*, 592 F.2d 263, 267 (5th Cir. 1979) (just over four hours); *Riva v. Kirkland*, 315 F. App'x 667, 669 (9th Cir. 2009) (one hour). Regardless of the time interval required, the United States can hardly argue that such a significant period passed here, when only minutes had elapsed between Grant's invocation of his right to remain silent and the agents' return to the room.

The third factor, whether the agents restricted the interrogation to a crime that had not been a subject of the earlier interrogation, also favors a finding that agents did not honor Grant's right to silence. Although the agents came back into the room asking Grant about a car he had been

driving, they resumed talking to him about the same gun crimes as the previous conversation. [Interview 3:42:29-3:43:12]. When the agents return to the room, Grant appears to be reluctant to talk to them. After approximately six minutes of asking him questions about his cars, and assuring him that there was no federal charge for such a crime, the agent asks Grant, "I asked you a lot of questions Javonte, do you have any questions for us, man?" [Interview 3:42:21]. This is a question that the agent "should have known [was] reasonably likely to elicit an incriminating response" *Fleming*, 556 F.3d at 526. Grant responds to the agent's question, "This is crazy, bro. So I'm about to go to jail, because, for some guns I don't own, they're not mine. And the gun that was mine, in my shit, is my girl's. So I'm basically going to jail for some shit that I didn't even." [Interview 3:42:29-3:43:12]. This statement is not Grant "evinc[ing] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). He told the agents repeatedly that he "did not want to talk," and when they returned a mere six minutes later, he kept his head down, and did not speak until spoken to. [Interview 3:30:12-3:43:12]

The facts here are distinct from *Bradshaw*, where the respondent's question "[w]ell, what is going to happen to me now?" was asked before respondent being "subject[ed] to further interrogation by the authorities." *Id.* at 1043–44. Similarly, in *Fleming*, the officers were not "interrogating" the defendant when he voluntarily confessed, and "there was no evidence that they tried to 'wear down' Fleming's resistance." 556 F.3d at 529. In *Bradshaw*, the defendant spoke first. *Id.* Grant did not. [Interview 3:36:20-52]. This factor favors finding that Grant's right to silence was not honored. After some time "wearing down" his resistance, the officers asked a question that they knew or should have known was reasonably likely to elicit an incriminating response. *Fleming*, 556 F.3d at 529; [Interview 3:42:21]. Then, without refreshing his *Miranda*

warnings, the agents discussed the same alleged crime as the initial interrogation that led Grant to invoke his right to silence. [Interview 3:42:21]. *See also United States v. Jones*, No. 2:18-CR-187, 2019 WL 3388436, at *8 (S.D. Ohio July 26, 2019) ("the [*Miranda* warnings] factor also weighs against the United States because [the officer] discussed the same alleged crime with Defendant that led to Defendant's earlier invocation of his right to remain silent (i.e. possession of a firearm)").

The factors favor finding that the agents did not honor Grant's right to silence.  No significant time period passed, no fresh warnings were provided, and the interrogation was not restricted to a separate crime.  [Interview 3:42:21]. *Fleming*, 556 F.3d at 529. *See also United States v. Guerra*, 237 F. Supp. 2d 795, 800 (E.D. Mich. 2003) (finding defendant's right to remain silent was not scrupulously honored when questioning about the same crime resumed after 35 minutes, in the same room, and the officer returned to the room under the premise of securing defendant's signature on his *Miranda* card).

Based on the videotaped interview and the facts presented, the Court finds that Grant's second statement, "I don't want to talk no more," was a clear and unambiguous invocation of his intent to remain silent, which was not honored.  *See Berghuis*, 560 U.S. at 382.  As a result, all statements elicited after Grant invoked his right to remain silent [Interview 3:30:12] are inadmissible. *Mosley,* 423 U.S. at 103–04.

24

### III.    CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

1)  Grant's Motion to Suppress [DE 51] is **GRANTED in part** and **DENIED in part** as set forth above.

Rebecca Grady Jennings, District Judge
United States District Court

October 25, 2021

Cc:    Counsel of record

25